Good morning, Your Honours. Nicholas Porrett of the Levy & Kuczynski firm. On behalf of the appellant, Mike Hernandez, I'd like to reserve three minutes for rebuttal, if I may. Your Honours, this is another securities class action involving statements made by management of a software developer called THQ from May 2011 through November 2011. THQ is no longer defendant and has since entered bankruptcy as a result of the difficulties that are the subject matter of this lawsuit. THQ specifically is a developer of video games. Video games, as we explained in the complaint, are primarily driven by three different consoles. We talk about the Nintendo Wii, W-I-I, the Microsoft Xbox, and the Sony PlayStation. In May 2011, THQ was reporting a series of disappointing results, but at that point in time it said that it had optimism and projected optimism for the third quarter coming up of its fiscal 2012, which was the holiday period for 2011, based on a series of products coming along, one of which was the U-Draw. U-Draw had been a successful product launched in 2010 for the Nintendo Wii, and the strategy of the company, which the management, the defendants Farrell and Pacino, stressed would help revive its prospects, was to transition the U-Draw from the Nintendo Wii to the Xbox and the PlayStation. The difficulty presented, as we discussed in the complaint, is that the demographics and the demand of users of the Xbox and PlayStation were very different from the Nintendo Wii. Nintendo Wii has a more family, child-oriented demographic, appeals to that particular segment, and the U-Draw was successful in that segment. The Xbox and the PlayStation have a far different demographic, less family-oriented, more adult, more mature, and less interested in what is essentially a child's toy, like the U-Draw. THQ had never successfully transitioned a product from the Wii to... Well, in fact, in some of its statements, it says we've never done this. Correct, Your Honor. I'm not sure that helps you very much, because that's one of the things they said, and that they're now relying on as part of the cautionary statements as a qualification for the forward-looking statements. I understand that, Your Honor. The point being is that despite having no track record to fall back on, they nonetheless projected optimism, and more than just simple statements of optimism, but they later went on in the July statements, the second set of statements that we allege were misleading. They state very specifically, we have these number of sales, we are projecting up to 2.6 million in sales through of this product, and we have the statements alleged in the complaint from the confidential witnesses about how the sales projections for the U-Draw for the fiscal 2012, for the late 2011 period, were developed by Farrell and Pacino, contrary to the expectations of the sales department. They're actually the sales managers who actually knew or had some knowledge about how it would sell, contrary to an independent marketing study that the company commissioned, you know, wisely, not knowing what the demand would be. But if you have reached out to the people who know about the likelihood of sales, I think you cannot then just ignore those projections and those statements when you are making public and replace them with your own essentially unfounded speculation and projections of what the demand will be. Can I just back you up just a little bit? Certainly. Do you dispute that any of the statements that are at issue are not forward-looking statements? So, this raises a, I think, some complex statement or issue under the law, which is any statement of projections sort of contains, is always inevitably a mixed statement because it contains both, yes, we project we will sell X million dollars in the future, but it also has a statement of present fact in the sense that, and this is the company's current best estimate of what those projections will be. That sounds like another way of saying a forward-looking statement. Right. I mean, I didn't get from your brief that you were arguing these weren't forward-looking statements. I think they are forward-looking. The omission, if you like, or some of the misleading elements of why the statements were misleading was the failure to adequately disclose the basis for them, which I guess under the PSLRA definition of forward-looking statement includes assumptions and presumptions underlying forward-looking statements. So, yes. So, your concern is that they didn't give it adequate cautionary? I think the cautionary language, I think, so I think the statements were misleading and they were, they really had no reasonable basis in fact and therefore they're misleading under existing precedent. I think they weren't accompanied by meaningful cautionary language to therefore qualify under the safe harbor. So, and I think we are made with scienter. I mean, fundamentally, I think we go back to the test this court advocated in Brody, which was did they knowingly present a misleading impression of the company that was materially different from what actually existed at the time. I think reading the complaint fairly as a whole and holistically, I think the question is undoubtedly yes. That is the impression that Farrell and Pacino certainly misled the market as to the prospects of Udraw and their expectations for sales of Udraw into this new demographic of the Xbox and the PlayStation customers. And although I understand about what Ford in hindsight means, but at the same time, I think the spectacular and rapid failure of the actual efforts of the sales efforts in the late of 2011 is nonetheless a data point that the court can consider, considering that maybe the projections weren't just optimism or a company just being thinking they were going to ESA being just too optimistic, but actually a blatant misrepresentation of what the reasonable expectation of what they would be. So it's that they knew that this Udraw was not going to make it on the other two platforms. Correct, Your Honor. And I think they knew, your allegation is that they knew that and they never really fessed up. I think they were sort of, I think they got, they knew that, they were unwilling to admit that publicly because that would have been, they really had very little else to fall back on, or this was one of the key products. And so that would have been catastrophic for the company. And I guess maybe they were just hoping that maybe they would, that everyone else was wrong and maybe they would in fact sell. So maybe that a miracle would occur at the end of 2011. But no one else, no one was predicting a miracle and I don't think that's a reasonable basis for making disclosures to the public that a miracle will happen. So as I was saying, you know, this wasn't just a small miss. I mean this, they dramatically missed. I mean they sold far fewer than they'd even sold the year before when they were projecting they were going to sell more than they'd sold the year before. So they were dramatically short. And that was disclosed very quickly after they actually launched it in that holiday period. So the district court fundamentally relied on the safe harbor. I think if you look at, and we went through it in our brief, if you look at the cautionary statements that the court relied on and which the defendants still rely on, they haven't identified any additional ones that the district court did not rely on, I think they safely qualify under boilerplate or generic statements. There's only one that specifically mentions the U-draw. And that is really a question about hardware, about that U-draw had never, that THQ had never previously developed a hardware product before. And the U-draw was a combination of software and hardware. But that wasn't the risk that materialized here. I mean the U-draw didn't sell because the hardware didn't work. I mean U-draw sold because it was fundamentally unappealing to the demographic that they said it was going to appeal to. And they knew that. So I don't think that risk factor is specific enough to the risk that eventualized. Looking at cautionary factors, we know that boilerplate is not sufficient. That's apparent from the legislative history of the PSLRA. It's apparent from this court's prior jurisprudence under the bespeaks caution, which the PSLRA safe harbor is based on. So I think it's clear and it's been uniformly held in other circuits. So I think it's no question I would submit that that would be the law or is the law here on the Ninth Circuit. It's fundamentally a contextual inquiry specific to the risk and to the company that is actually involved and what risk actually materialized to cause the loss. The other two statements, again, rather generic statements about fluctuation in quarterly demand, saying it could go up and down during the course of a year, a factor that's identical for every retailer operating in the United States. And again, isn't really the risk that materialized here. So the court relied upon, I'd just like to talk about the two precedents that the district court did talk about, Kutera and Intuitive, both of which I think are distinguishable and not applying here. I think both of those are examples of how you have to look at the risk factors in the context of what has actually been disclosed by that company at that particular point in time. So in Kutera, although the court, in talking about the risk factors, identified a fairly generic statement saying a risk factor was that Kutera's ability to continue increasing sales performance worldwide, that was in the context of already fairly detailed disclosures about what the new sales strategy was in Kutera. And so therefore, read together, that was a meaningful cautionary statement here that is not present in this case. Similarly, in Intuitive, and also in Kutera, it looks as if the plaintiffs in that case did not even dispute that the cautionary language was meaningful. Let me ask you one question. When you said that the failure to achieve success on the various, on the two new platforms, Microsoft X, what is that, X3? Xbox 360, I think it was, and PlayStation 3. One of the cautionary statements in the form taken for March 31, 2011, was high development costs for games which do not perform as anticipated and failure of platforms to achieve significant market penetration. Why isn't that, isn't that talking about the very thing you were, you just mentioned? I don't believe it is. Once again, I think that's a very generic statement, not specific to, obviously it's not specific to Udraw itself. I think it comes from the March, it's both in the 2010 and 2011 10K. At the time, the 2010 10K was written and published, the Udraw hadn't even been marketed to the Nintendo Wii. And above that, they also have our inability to acquire or create new intellectual property that has a high level of consumer recognition or acceptance could negatively impact our sales and profitability. Again, I would submit two things. One, I think those are not much material. I'm not sure what useful information is being conveyed to investors by those statements. I don't think that's much different from simply the statement that actual results may differ. There's other statements that follow. But I think those statements, again, read in the context of where they are, they're not specific to the Udraw. I think as this court did in the Livid case, which we cited, you need to look, if they wanted to warn about the risk that the Udraw would not be accepted by the Xbox and PlayStation demand because they had independent consulting reports suggesting there would be limited acceptance, they could have crafted a warning language very different from what they crafted, what they set forward. Then there's the following warning about they're not a hardware company. Correct, Your Honor. Software company, and they specifically refer to Udraw as our first hardware product. Correct, Your Honor, and that's what I addressed earlier, which is that that's not really the risk that's eventualized here. That's a risk that by branching out into hardware, and they never previously manufactured hardware, that could create potential, that could be a risk. You know, one of the things I have trouble with is this whole area of law, is that these people speak a different language, and everybody understands they speak a different language. The world I come from back some years ago was the world of academics, and you need to understand how letters of recommendation are written. So when someone writes, this is an outstanding candidate, and I very strongly encourage you to give him the most serious consideration, what that means is don't hire him. But you have to be in the world to understand that. Well, if you're in the world of security stuff, and you get these people talking about all this optimistic stuff, what constitutes an adequate warning has to be understood based on the language that you people speak, or rather that they speak, and as far as I can tell, they spoke enough to let you know that they have no idea whether they're going to make any money. Well, Your Honor, I don't think it's enough just to simply say, you know, we have our fingers crossed when we're making these representations, and I think that's what these statements are kind of driving towards. I have to say I'm sympathetic. And I don't think that's what the law allows. I mean, the law says very clearly it has to be meaningful. We refer to the decision of the Court of Appeals for the D.C. Circuit, which I think gave a very, you know, the most recent and, in fact, most detailed sort of exploration of what it means to be a meaningful cautionary language, and I think that's completely consistent with this Court's prior opinions. And it talks about how it's got to be important. It has to be specific. It has to be useful. And none of this is that. As I understand your position, and tell me if I misunderstand it, you're saying it's not enough to say we're not a new company that doesn't really know what we're doing. That's something that should be fairly obvious, and it's true with every new company. As I understand what you're saying, is that this is something that makes this a specific high risk that you ought to know about. And one thing you ought to know about is that – and maybe everybody should know this anyway, too. I don't know. But as I understand your position, it's that there is a totally different audience for the two markets we plan to enter, and because that is an entirely different market that doesn't ordinarily accept this type of product, this is a high risk venture. The market we've been successful in attracts a different audience. The market that we're going into has not historically welcomed and is not a good prospective market for our type of product. Is that the kind of – and therefore it's a high risk? Is that what you're saying they should say? Something along those lines, John. I don't need to craft, but I think the UDRAW was a risk that was different from what they had faced in the past. There was always a risk between different consoles, whether a product would transition easily between or be marketed equally or accepted equally amongst the different consoles. But UDRAW was unique in the sense that it was a child's product that they were trying to transition from the Wii to the Xbox and to the PlayStation they had not done before. And I think it was a specific risk that I don't think was covered by these somewhat generic risk factors that they'd said in 2010 before the UDRAW even really existed. And so I don't think it applied or it applies with enough specificity or meaning, to quote from the statute, to cover the risk that ultimately was realized. If you want to ask further questions, I know I'm out of time, so I appreciate your indulgence. Thank you. Good morning, Your Honors. My name is Ryan Blair from Cooley. On behalf of the FLEs, Brian Farrell and Paul Puccino. Now, I want to talk quickly because it came up about meaningful cautionary language, and I want to quote precisely what the cautionary language was within the record. Quote, UDRAW may fail to achieve sales expectations.  Is that something that you're saying? Any company couldn't say it's doing something new? Well, this is specific in the case of video games. But isn't it true generally that any time you bring a new product or a product to somewhere else, it could fail? That's not very specific. Is it to this product as opposed to all others? Sure. Your Honor, that's a great question. Thank you very much. The cautionary language has to be considered in conjunction with all of the other risk factors that THQ stated in their public filings. They've said, and this is specific to video games, that fluctuations in the size and rate of consumer demand for titles of different platforms, meaning the Wii, the PlayStation 3, the Xbox 360, could negatively affect sales. That's precisely the risk that came to fruition here. Well, but they're not giving you any way of assessing that risk. They're just saying what anybody would say in an F1 textbook. I have no ability, based on that statement, to understand that there's a particular risk here. That's very generic where you just read me. Well, there was not a known risk here. Now, what plaintiff has alleged is that there is. Of course there was a known risk. The question is how big is the risk and so on. Sure. Well, and I would say, I would represent that THQ clearly provided the risk that it was formerly a software company, not a hardware company, that it had limited experience in developing the hardware products like the UDRAW, and that the failure to achieve market penetration could decrease profitability. Now, this is my ignorance. UDRAW is a hardware product? It is a combination of a hardware product. Imagine a 4x6 tablet where you would put your remote control for your video game system into this tablet and you would have a pressure-sensitive stylus. No, I understand that. So you're saying it's not just software but also hardware. That's correct. It's not a purely hardware product. That's correct. And to be clear, there are 17 pages of detailed risk warnings that the plaintiff itself acknowledges are extensive, that the video game industry as a whole is highly hit-driven, and it specifically makes the distinguishing between the Wii and the PS3 and the Xbox 360. Now, the changing in market demographics, I want to touch on that really briefly, it's a little bit of a misnomer. These consoles are expensive. If you are a family of four and have, let's say you have two older children who like to play more advanced video games, and you have two other younger children who may prefer the UDRAW or something that families can play, that is specifically what THQ was trying to go for here. And I want to be clear. There is substantial evidence in the record substantiating THQ's management's belief that the UDRAW would be successful on the PlayStation 3 and the Xbox 360. First, you have the only historic fact in this case, which is the launch of the UDRAW on the Wii. Now, when it was launched in the holiday season of 2010, THQ projected, like they did here, 1 million units of sales. It sold 1.7 million units during that holiday season, a 1.7x markup over what they expected. Secondly, at the same time that this UDRAW was going to be released on the PS3 and the Xbox 360, the video game industry as a whole was expanding from $10 billion in 2009 to $26 billion in 2011. Now, those figures alone corroborate what is also in the record, that THQ had two independent studies that indicated a sizable market for the PS3 and the Xbox 360. Didn't the company commission an independent study that stated that UDRAW would not catch on with the users of the Xbox or PS3? Your Honor, that's what they allege. And I think Lipton is absolutely crystal clear here that they may paint negative characterizations of that report, what's called the EDAR report, but there is not specific reference to any contents of those reports or anything. There's no details from them whatsoever. In these types of cases, you don't get to say there was a report, and with the benefit of hindsight, because a product didn't sell, the report had to be negative. Well, it's not just a report. It's a report the company commissioned. And so the company was warned that this would not catch on with these particular types of market. And then there's an allegation that the employees of the company also objected to the idea that this product could catch on in those demographics. Absolutely, Your Honor. The thing is this. So they may be wrong, but that's the risk that they're talking about. Whether they're right or wrong, it seems to me it strongly suggests that that's the particular risk that people should be advised of. Well, the allegations regarding internal reports need to be specific and have details and have the contents of them be told. You need to say in a complaint, on date X, the report said Y and Z. And this is why it differed from the company's, as they stated, two independent reports indicating a sizable market. Here there is no X, there is no Y, there is no Z. I mean, you can even start at the very basics. When was this report issued? Suppose this EDAR report was issued before the launch on the Wii. In that case, one would be wrong. The reports you're talking about. I'm sorry? The reports you're talking about as opposed to the report they're talking about. Sure. Hold on. Your reports, are they alleged in the complaint? They are alleged in the complaint. They're at paragraphs 69 and 75 of the complaint. They talked about after the UDRAW did not sell as expected, when THQ, far from hiding the bad sales of the UDRAW on the PS3 or the Xbox 360, they freely announced that the sales were below expectations and that they were against expectations based on the previous sale of the UDRAW on the Wii and two independent studies that indicated a strong appetite and market for the UDRAW on the PS3 and the Xbox 360. Now, it's plaintiff's obligation to provide particularized facts that show that those statements were actually false. Plaintiff has conceded that we're talking about forward-looking projections. We're not in the realm of deliberate recklessness here under Zucco. You have to show, under QTERRA, you have to show actual knowledge that the defendants knew that their projections were false or impossible. And here, the EDAR report, which they make reference to, doesn't say anything. And, Your Honors, Judge Pius, Judge Reinhart, if you want to talk about what is needed in these internal reports, what types of details, I refer you to your decision in Oracle, which was 380F3D at 1231. Now, in that case, there were allegations of specific reports, reports so detailed that it showed the defendants knew precisely when they would miss projections and by what percentage. That would be 50%. Judge Fletcher, you had a similar decision in the Verifone case, where there were particular flash reports of current sales detailing the actual percentage of sales and how much that would miss projections. There is nothing anywhere remotely resembling that here. And to be clear, we don't even know who actually saw this EDAR report. CW1, who is the only confidential witness who is alleged to have had personal involvement in creating the projections, didn't even mention it. And CW2, who is the absolute only one who alleges this report's existence, he didn't even see it. Indeed, if you look at paragraph 39 of the complaint, all he alleges is that what he understood THQ did beyond the report itself. And, you know, even more important when examining Scienter, and again, the standard is actual knowledge here, not deliberate recklessness. There are no allegations as to when Mr. Farrell or Mr. Pacino saw this report. Was it before or after they issued their public projections? Was it before or after they reviewed their two independent studies, which indicated a sizable market? How specifically is the EDAR report different than these two market studies? And why were Mr. Farrell and Mr. Pacino supposed to follow the EDAR report versus what they had done internally? Again, the prior, you draw sales on the Wii, two studies, and an analysis of games that had previously ported over from the Wii to the PS3 or Xbox 360. If I can interrupt you, I think we diverted you a little. You began by reading us a couple of statements that were designed, that you say were designed to be qualifier or cautionary statements. I think you had more in mind. I don't think you made it all the way through your list. Is that right? Sure. Can you give me some more of those things? The first two I find kind of generic. I mean, maybe not all as helpful as you'd like them to be. Sure. That's fine. And, again, I refer the Court to the record at 195 to 212. There are 17 pages of detailed risk warnings, you know, specifically at ER 197. Additionally, if our games do not achieve significant market penetration, we will not be able to recover our development costs. Well, that seems to be obvious. Sure. But that's not the real risk. Sure. If you wouldn't recover your development costs. Well, the real risk is sales not performing to expectations, and that is the express risk that mentions the U-draw. Now, Kutera is clear. The risk warnings. I invited you to give me, like, for example, read me the list, the statement about, you know, that we've not transitioned to hardware before. Would you read that one? That one strikes me the strongest in your favor, and you've not read it to me yet. Well, I would say we're dealing with projected sales of a new product, and that falls square in line with the risk warning that you stated. We're a software company, not a hardware company. Because of that, our sales may not meet expectations. And, again, if you look at the warnings in Kutera and Intuitive Surgical, they're probably less meaningful than the risk warnings we have here. In Kutera, the risk warning is its ability to continue increasing sales performance worldwide could cause results to vary. That, similarly, could be any product in any business in any industry. Now, in Kutera, they don't even mention the product at issue, which was called the Solera Opus. Did they tell you in that case why they might have an inability to continue worldwide? Or did they just say, well? So there was another risk warning that talked about it was the ability of their sales force to be able to sell their products to customers. Again, that's, at the very least, less meaningful than the risk warnings we have here. Intuitive Surgical is absolutely no difference. It was the failure, Intuitive Surgical, failure to achieve market acceptance of its products. How is that any different than the risk warnings here in THQ? I don't know how anyone could say that tells you very much. Well, I would agree when these are considered collectively, and, again, these risk warnings attach to every public statement made during the class period, of course, because plaintiffs rely on it. It's really like saying if it doesn't work, it won't work. If we can't sell our product, this won't be a good deal. You know, I have the same problem Judge Fletcher does. I read recommendation letters, and I once called a professor, and I said, does it matter that you sent me about student A, he's very, very, very good, and student B, he's very, very, very, very good. And he said to me, did I do that? But sometimes it's a signal, and sometimes – but I don't understand that if – I wouldn't be reading any of these letters that you're talking about here, so I come to it without any background. But if I read a letter that said, you know, if our product doesn't sell, this isn't going to be a good investment, I don't think that would add anything to my knowledge of the idea, is this a good investment. Of course, if it doesn't work, it's not going to be good, or if it doesn't sell, it's not going to be good. But what is it that makes this a risk different from all other products? Sure, and I would say that, again, we're dealing with projections. There were no risks known by THQ or Mr. Farrell or Mr. Pacino above and beyond what are contained within these 17 pages of risk warnings. They made projections. There are no underlying omitted facts. And Justice Kagan made absolutely clear in Omnicare that there's a difference between facts, which are things that happened and events, versus opinions, which are statements or beliefs. And at most, this EDAR report, which we don't even know what it says, CW2's opposition, we don't know when he said that, but those are opinions, not facts, and they don't have any risk above and beyond what's contained in these risk warnings. I say that they are absolutely meaningful with respect to the industry in which THQ operated, and no reasonable investor would have read these and then still thought that it was a guarantee that the UDRA would sell on the PSC. Well, if I read something that was a guarantee that it would make money, I'd like to buy that. Okay, thank you very much. Thank you, Your Honor. Okay, we'll give you two minutes to respond. Thank you very much, Your Honor. I have four points, and I'll try and be quick. One is on the intuitive case. Counsel directed you to the somewhat generic statement. There is actually a longer statement of the risk factors involved in intuitive cited by the Court of Appeals. So it is earlier in the report on the background of procedural history, so I would refer you to that. I think reading that in the context of the other risk factors cited by the court makes it plain that it's not just the generic statement that is cited in the argument on the safe harbor, but in the context of all the risk factors provided in that case, which are much more extensive. And, in fact, the district court referred to them as well in their opinion, which the Court of Appeals adopted. Kutera, much the same point. They were earlier in the report. It makes very clear that the key statement there about putting forward the sales force was in the context in that same time frame of detailed descriptions about what the sales force, the changes in the sales force had been undertaken, why it was undertaken that way. Then there's a risk that maybe it won't work, and the risk that realized there was the fact that this changed sales strategy didn't work. So I think, again, they're far more detailed and more relevant than they are here, far more tailored to the fact. If I could turn briefly to the two independent studies, I think counsel is somewhat overstated to say that they're related in the complaint. The statements by Mr. Farrell, which he refers to the independent studies, are referred to in the complaint where he comes forward and says sales haven't eventualized. The independent studies themselves, we make no allegation that they even exist, or we've alleged that Farrell made a statement about them. I don't think that's enough for the district court or this court to rely on. We do allege about the EDI report, we think the CW2 there, who was a senior vice president and was on the executive management team, I think has sufficient credibility on the contents of the EDI report to meet this court's precedent. Thank you. Two minutes. Okay. Thank you very much. I appreciate that, Your Honor. All right. Case just argued will be submitted.
judges: Reinhardt, W. Fletcher, Paez